Elliott Sirvan WATSON, Appellant,

v.

The STATE of Texas, State.

No. 2–93–062–CR.

Court of Appeals of Texas,
Fort Worth.

Sept. 14, 1994.

Publication Ordered Oct. 19, 1994.

Michael Logan Ware, Law Offices of Michael Logan Ware, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Betty Marshall, Charles M. Mallin, Asst. Chief Appellate Section, Anne E. Swenson, Asst. Crim. Dist. Atty., Fort Worth, for State.

Before WEAVER, HICKS and FARRAR, JJ.

## OPINION

WEAVER, Justice.

Appellant, Elliott Sirvan Watson, was charged by indictment with the offense of murder. *See* TEX.PENAL CODE ANN. § 19.02 (Vernon. 1994). The State alleged appellant stabbed his mother to death with a knife. Appellant plead not guilty and asserted the affirmative defense of insanity. A jury convicted appellant of the charged offense and assessed punishment at life imprisonment and a $10,000 fine. Appellant challenges his conviction through ten points of error. We affirm.

Appellant was arrested around noon on April 30, 1991, the same day as the offense occurred. Following his arrest, appellant signed two written statements which were admitted into evidence before the jury. The first statement was given on April 30, 1991, just a few hours after the murder, and the second statement was given on May 2, 1991, two days after appellant's arrest.

Appellant admitted to stabbing his mother in both written statements. According to the statements, appellant's mother had caught appellant's girlfriend, Laura, in his bedroom early on the morning of the offense. After she ordered Laura to leave the house, appellant and his mother had an argument over whether Laura would ever be allowed to come back to their house. Following the altercation, appellant went back to his room and waited for Laura to finish getting ready to leave. After Laura left, appellant got a butcher knife from the kitchen and went into his mother's bedroom, where he stabbed her numerous times causing her death.

In his first point of error, appellant contends the trial court erred in denying his

*Batson*[1] motion. Because appellant is black, and because the State exercised peremptory strikes on two black prospective jurors, Lawrence Alexander and Bellenger Morgan, appellant raised a *Batson* issue prior to the dismissal of the prospective jury panel and prior to the swearing in of the jury. On appeal, appellant concedes the State's race neutral explanation for striking Alexander was sufficient and does not challenge this peremptory strike. However, appellant argues the explanation given by the State for striking Morgan was not plausible, and that the trial court erred in finding that the State struck Morgan for a race neutral reason.

■ Once a defendant makes a prima facie showing that the State deliberately used peremptory challenges to prevent minorities from sitting on the jury, the burden shifts to the State to give a racially neutral explanation for striking the venirepersons in question. *Cantu v. State*, 842 S.W.2d 667, 688 (Tex.Crim.App.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993). In the present case, after appellant raised his *Batson* challenge, the trial court asked the prosecutor to explain her race neutral reasons for striking Alexander and Morgan. Thus, the court impliedly found a prima facie case of racial discrimination. *See Dewberry v. State*, 776 S.W.2d 589, 592 n. 2 (Tex.Crim. App.1989).

■ In reviewing a *Batson* challenge, we review the evidence in the light most favorable to the trial court's ruling. *Cantu*, 842 S.W.2d at 689; *Tennard v. State*, 802 S.W.2d 678, 680 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991). We will not overturn a trial court's finding that the State exercised its strikes in a racially neutral manner unless the ruling is clearly erroneous. *Whitsey v. State*, 796 S.W.2d 707, 726 (Tex.Crim.App. 1989). Thus, our role as a reviewing court is not to determine whether the prosecutor's explanations are credible. Our role is to determine whether the trial court's ruling on the *Batson* motion was supported by the record. *Id.* at 716.

With this in mind, we will only disturb the trial court's ruling if, after reviewing the evidence, we are left with the definite and firm conviction that a mistake has been made. *Hughes v. State*, 850 S.W.2d 260, 265 (Tex.App.—Fort Worth 1993, pet. ref'd). If the trial court's findings are supported by the record, its ultimate conclusion that the prosecution exercised its peremptory challenges with no purposeful discrimination is not clearly erroneous. *Williams v. State*, 804 S.W.2d 95, 101 (Tex.Crim.App.), *cert. denied*, 501 U.S. 1239, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991).

Before stating her reasons for striking Alexander and Morgan, the prosecutor pointed out that two members of the seated jury were black and that the deceased victim was also black. The prosecutor then explained her race neutral reasons for striking Alexander, and the trial court found that these reasons were sufficient. As noted above, appellant concedes the State's race neutral reasons for striking Alexander were sufficient and he does not challenge this peremptory strike. However, appellant does challenge the trial court's ruling that there was no racial motivation behind the State's striking of venireperson Morgan.

After giving her explanation for striking Alexander, the prosecutor then gave her reasons for striking Morgan. These reasons are set out in the following exchanges:

> [PROSECUTOR]: Yes, Your Honor. The defense attorney at the bench stated that I didn't ask Mr. Morgan any questions, but I did. I asked Mr. Morgan some questions regarding testimony of expert witnesses. I asked him if he felt that he would have to accept testimony of a psychiatrist or psychologist just because of their background, training and education. And he indicated to me that he felt that he would; that if you go to a doctor and they give you a prescription, you trust them; you rely on them. I said, "Haven't you ever heard of a bad doctor or a doctor who doesn't—" And he said, "No. They've gone through that education. They know what they're doing."

---

1. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

In this case, the defense is going to in all probability call a Dr. Jeannie Deschner, a clinical psychologist. She has offered an opinion that the defendant was insane at the time of the offense. She also before she rendered that opinion was able to interview the defendant for a couple of hours. The State also will likely call an expert witness, that being Dr. Turbeville who is a psychiatrist. We did ask for a Court Order appointing Dr. Turbeville and allowing her to interview the defendant. However, he refused to speak to her. So her opinions are not going to be based on an actual interview with the defendant which I think leaves us at a little bit of a disadvantage.

In addition, since Mr. Mitchell asked me earlier about Mr. Alexander's being attentive to me, I didn't feel Mr. Morgan really was, and that's just a subjective impression. But I didn't feel like he was paying that much attention. He looked like he was kind of nodding off during the voir dire.

[DEFENDANT'S ATTORNEY]: Your Honor, I'd ask to see the State's notes on the jury selection of this case to see if any notation was made regarding not paying attention.

[PROSECUTOR]: Well, Your Honor I will say that—

[PROSECUTOR]: I have notes on mine.

THE COURT: Would you make—if you'll show those to Mr. Mitchell.

[DEFENDANT'S ATTORNEY]: Let's introduce these in evidence, Your Honor, if we could.

THE COURT: Are you getting them marked? I'm waiting for you to get them marked.

[DEFENDANT'S ATTORNEY]: Your Honor, I'm waiting for them to hand them to me. I apologize for it.

THE COURT: I think the one you're concerned with is—

[DEFENDANT'S ATTORNEY]: Your Honor, we'd offer Defense 4 and Defense 3 for the sake of the record.

THE COURT: Any objection?

[PROSECUTOR]: No, Your Honor.

THE COURT: They will be received.

[DEFENDANT'S ATTORNEY]: May I ask the prosecutor a few questions, Your Honor?

THE COURT: All right.

[DEFENDANT'S ATTORNEY]: Your Honor, my first point—let's see. [Prosecutor], a few moments ago you said Mr. Morgan said that he would believe all doctors; is that correct?

[PROSECUTOR]: As I recall, that's pretty much what he said.

[DEFENDANT'S ATTORNEY]: And all doctors would include not only Dr. Deschner but also would include Dr. Turbeville; is that correct?

[PROSECUTOR]: Yes, it would.

[DEFENDANT'S ATTORNEY]: I think you also said that he would—he said he'd have to trust anyone to make a determination about education that Dr. Turbeville and Dr. Deschner had; is that correct?

[PROSECUTOR]: That's what I'm recalling, yes.

[DEFENDANT'S ATTORNEY]: So he, basically, told you he would trust all experts. Both these women are experts in mental health; is that correct?

[PROSECUTOR]: That's correct.

[DEFENDANT'S ATTORNEY]: Did he tell you that he could make a fair and impartial decision in this case based on the credible evidence he heard?

THE COURT: Excuse me just a minute. Counsel, my recollection is the same as what's been outlined by the State's attorney. I don't think we need to go back over these things again, again and again. The record is there.

[DEFENDANT'S ATTORNEY]: Well, Your Honor, I'd like to put Mr. Morgan on the stand. The State's made—one of the prosecutors made allegations he was asleep during part of the voir dire. I'd like to put him on the stand so he can tell us whether or not he was asleep or whether this is a fabricated, fictitious reason to strike.

THE COURT: Whether or not he was asleep, I'm going to find that because your client would not allow—would not be interviewed by the State's expert, that that in and of itself is going to be sufficient reason to show that there is no racial motivation on the striking of this juror. We have a raised a mutual reason for it. And that's based on the idea that whenever you finally get to the situation where you have two experts that he indicated that he would listen to and you have one that has not been able to interview and the other one who has been able to interview, that in itself and of itself would give him reason not to be fair to the party who is saying they struck him for a racially-mutual reason.

On appeal, appellant contends Morgan's responses to the prosecutor's questions were the same as that of the entire jury panel. Appellant specifically claims Morgan's responses were the same as venireperson Wierzbicki, who was not struck by the State and who actually served on the jury.

 Once the prosecutor has articulated a nondiscriminatory reason for challenging the venireperson in question, the defendant can offer evidence that the explanations were merely a pretext. *Keeton v. State*, 749 S.W.2d 861, 868 (Tex.Crim.App.1988). One type of evidence that can show pretext is "disparate treatment," *i.e.*, persons with the same or similar characteristics as the challenged juror were not struck. *Id. See also Wiese v. State*, 811 S.W.2d 958, 960 (Tex. App.—Fort Worth 1991, pet. ref'd). In the present case appellant claims the State treated Morgan "disparately" by striking him for responding to the State's questions in the same manner as a white venireperson who was accepted by the State. However, the record does not support this argument.

 The State's *voir dire* of Wierzbicki, which appellant relies on, does not support his argument that Morgan was treated disparately. Wierzbicki's testimony regarding how she would view expert psychiatric testimony is set out in the following exchange:

[PROSECUTOR]: Let's try—is it Ms. Wierzbicki?

VENIREMAN WIERZBICKI: Yes.

[PROSECUTOR]: What are your feelings?

[WIERZBICKI]: They're supposed to be experts and they study a long time to learn what different individuals say. I feel like their testimony is just as good as a physicians would be.

[PROSECUTOR]: And that's one thing that you hear about when you have an expert witness testify is what their qualifications are, where they went to school and how long they've been practicing. *But do you feel like if you have a psychiatrist or psychologist tell you something, that they must necessarily be right because they do have that training and they are a psychologist or psychiatrist?*

[WIERZBICKI]: *No.*

[PROSECUTOR]: *So you could evaluate the individual who's up there on the witness stand?*

[WIERZBICKI]: *Yes.*

[PROSECUTOR]: Okay. Thank you. [Emphasis added.]

Thus, Wierzbicki's responses to the State's questioning indicate she would evaluate what the expert said, rather than automatically accept it as the truth. The testimony of other members of the prospective jury panel also revealed that they would not always accept a testifying doctor's word as the truth.

In contrast to the similar responses by the other members of the prospective jury panel, Morgan's answers to the State's questions set him apart. In response to questioning about expert psychiatric testimony, Morgan testified as follows:

[PROSECUTOR]: Mr. Morgan, what are your feelings about psychiatrists and psychologists and their testimony?

[MORGAN]: Okay. Well, basically, it's the same as the lady said a few minutes ago. They're professionals and they know what they're doing and they operate, you know, just like a doctor. If a doctor gives you a prescription, you know—

COURT REPORTER: I can't hear you.

THE COURT: I think you might have to stand, if you would please.

[MORGAN]: Okay. I was saying it's like a doctor. If a doctor prescribes a prescription for you, you know, you're going to—scales of understanding, but that's just a professional. So just like a psychiatrist, *what he says or understands, because he knows what he's talking about.*

[PROSECUTOR]: *Have you ever—I mean, I'm just talking about friends or relatives—run across a situation where you thought maybe there was a doctor who didn't really know what he was doing or wasn't good at being a doctor?*

[MORGAN]: Well, everybody makes mistakes once in a while. *But not as far as not knowing what they was doing, no.*

[PROSECUTOR]: Okay. Thank you. [Emphasis added.]

Morgan's responses to the above questions could reasonably be viewed as indicating he would automatically accept the testimony of a psychiatrist as being true. This is not unlike a situation where a prospective juror is struck for cause because he testifies he believes a police officer would always tell the truth. *See Montoya v. State,* 810 S.W.2d 160, 171 (Tex.Crim.App.1989), *cert. denied,* —— U.S. ——, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991); *Hernandez v. State,* 563 S.W.2d 947, 950 (Tex.Crim.App.1978). Thus, having reviewed the evidence in the light most favorable to the trial court's ruling, we do not believe the ruling that the State's reason for striking Morgan was racially neutral was clearly erroneous. Point of error one is overruled.

In point of error number two, appellant claims the trial court erred in excusing a venireperson under article 35.16(a)(3) of the Texas Code of Criminal Procedure. This article reads in pertinent part as follows:

(a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:

. . . .

3. That he is under indictment or other legal accusation for theft or any felony;

. . . .

No juror shall be impaneled when it appears that he is subject to the second, third or fourth grounds of challenge for cause set forth above, although both parties may consent. All other grounds for challenge may be waived by the party or parties in whose favor such grounds of challenge exist.

TEX.CODE CRIM.PROC.ANN. art. 35.16(a)(3) (Vernon 1989).

Before formal *voir dire* began, the trial court apparently received information from the prosecutor that venireperson number four, Ruby Woolridge, might be absolutely disqualified under article 35.16(a)(3) for having a theft by check charge pending against her. Woolridge was questioned about this charge in the following exchange:

THE COURT: If you'll come up here, please, ma'am. Ms. Woolridge, the question has arisen—when were you born?

[WOOLRIDGE]: 1948.

THE COURT: And your date of birth?

[WOOLRIDGE]: July 5, 1948.

THE COURT: Okay. Now, are you under any sort of charge for theft or anything of that type?

[WOOLRIDGE]: *Not that I'm aware of.*

[PROSECUTOR]: Your Honor, we're not sure this is the same person. Is your middle name Fay?

[WOOLRIDGE]: Uh-huh.

[PROSECUTOR]: And back in—well, 1989, did you live at 1826 Carriage House in Arlington, Apartment 1403?

[WOOLRIDGE]: Uh-huh.

[PROSECUTOR]: Okay. She probably just isn't aware of it.

THE COURT: All right. Thank you very much. I'm going to excuse you. [Emphasis added.]

Following this exchange, appellant objected to the trial court excusing Woolridge. Appellant argued that since Woolridge had denied being under indictment for any current theft charge, the State had not proved she was disqualified.

Upon the trial court's request, the State then offered a two-page exhibit. The first

page of the exhibit is a copy of Woolridge's jury information sheet, which indicates her date of birth as July 5, 1948. The second page is a criminal person case list which the prosecutor printed out of the District Attorney's office computer. This list reflects a pending theft by check case filed against Ruby Faye Woolridge in 1989 in County Criminal Court Number 6. The list also reflects that at the time this charge was filed, the person charged (Ruby Faye Woolridge) lived at 1826 Carriage House, Apartment 1403, in Arlington, Texas. Appellant objected to the State's exhibit on the grounds it was hearsay, and argued that if the State could not tie Woolridge to the theft charge better than with a hearsay document, she was still qualified until otherwise proven. The trial court overruled this objection. On appeal, appellant now alleges the trial court improperly excused Woolridge. We disagree.

■ Whether Woolridge was absolutely disqualified was a question of fact to be resolved by the trial court in the first instance. *Hammond v. State*, 799 S.W.2d 741, 744 (Tex.Crim.App.1990). When there is conflicting evidence, a trial court has discretion to find, or to refuse to find, facts that would justify a challenge for cause. *Id.* at 744–45. In the present case, after Woolridge testified that she was not aware of any outstanding theft charge against her, the prosecutor offered the exhibit consisting of Woolridge's jury information sheet and a criminal person case list from the District Attorney's office. This information clearly indicates Woolridge did have a pending theft by check charge and, thus, was absolutely disqualified.

On appeal, appellant contends the State never properly authenticated the exhibit, and that as a result, the exhibit was hearsay and had no probative value. However, it is questionable whether the Rules of Criminal Evidence even applied to the trial court's determination of the preliminary question of fact of whether Woolridge was automatically disqualified. *See* TEX.R.CRIM.EVID. 1101(c)(1), 104(a). Furthermore, even if the Rules of Criminal Evidence did apply, the trial court could have reasonably determined that the State had met any authentication require-

ment. *See* TEX.R.CRIM.EVID. 901(a), (b)(7). Based on the evidence presented, we hold that the trial court did not abuse its discretion in excusing Woolridge under article 35.16(a)(3). Point of error two is overruled.

In point three, appellant alleges the trial court erred by admitting evidence, over objection, that the victim was pregnant at the time of her death. The contested evidence was admitted during the following exchange between the prosecutor and the pathologist:

[PROSECUTOR]: Dr. Sisler, after you completed your external examination, I believe you said you also did an internal examination?

A. Yes.

Q. And as a result of your internal examination, did you make a determination about whether or not [the deceased] was pregnant at the time?

[DEFENSE COUNSEL]: Your Honor, we'll object to the testimony on this issue under Rule 403. It's not relevant for any purpose in this trial. The probative value is outweighed by the prejudicial effect, and it's not an element of the offense the State has to prove in this case.

THE COURT: Overrule the objection.

[PROSECUTOR]: Were you able to make a determination of whether or not [the deceased] was pregnant at the time of her death?

[DEFENSE COUNSEL]: Same objection under Rule 403, Your Honor.

THE COURT: Overruled.

[THE WITNESS]: Yes.

[PROSECUTOR]: And was she or was she not?

A. I—on opening the uterus, I found a—

[DEFENSE COUNSEL]: Objection, Your Honor. Just to protect the record under Rule 403, the prejudicial effect outweighs the probative value.

THE COURT: You can have a running objection to this. I'll overrule the objection. Go ahead, if you would.

[THE WITNESS]: On opening the uterus, I found a fetus that I estimated the gestational age of approximately 14 weeks.

On appeal, appellant maintains that the trial court erred in admitting the above evidence because it was not relevant and because any probative value was clearly outweighed by the prejudicial effect of the information. *See* TEX.R.CRIM.EVID. 401, 402 & 403. The State contends the evidence was relevant and that the probative value of the evidence was not outweighed by its prejudicial effect.

■ " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R.CRIM.EVID. 401. This rule deems "relevant" any evidence which influences consequential facts, that is, facts that have something to do with the ultimate determination of guilt or innocence in the case at hand. *Mayes v. State*, 816 S.W.2d 79, 84 (Tex.Crim.App.1991).

■ In reviewing a trial court's determination that evidence is relevant, we must uphold the ruling absent an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 390–91 (Tex.Crim.App.1990) (op. on reh'g). "[A]s long as the trial court's ruling was at least within the zone of reasonable disagreement, the appellate court will not intercede." *Id.* at 391. Thus, an appellate court should hold that a trial court has abused its discretion only in those circumstances where the appellate court can say with confidence that by no reasonable perception of common experience could the trial court have concluded that the contested evidence had a tendency to make the existence of a fact of consequence more or less probable than it would have been without the evidence. *Id.*

■ In the present case appellant was charged with stabbing his mother to death. At the time of the offense, appellant was seventeen and he was an only child. He was living at home with his mother and stepfather, and he did not have a job. There was evidence presented that appellant and his mother did not get along very well, and that appellant felt his mother did not care about him. There was also evidence that appellant felt his mother expected too much from him,

that she expected him to get a job, and that his mother was pressuring him to move out of the house.

The State's theory, at least in part, was that appellant thought his status as an only child was coming to an end and that he was not going to get a "free ride" any longer. Consistent with this theory, the State introduced evidence showing that approximately two weeks before appellant committed the offense, he had found a book in the house about babies and about being pregnant. This caused appellant to suspect his mother was pregnant, even though his mother and stepfather had not mentioned it to him.

During the State's case-in-chief, the State introduced considerable physical evidence tying appellant to the offense. The State also introduced appellant's two written confessions where he admitted to stabbing his mother to death. After the State rested, appellant did not put on any evidence which tended to rebut the State's evidence that appellant committed the offense. Rather, he argued he was insane at the time of the offense. In this regard, appellant only called two witnesses to testify in his defense. The first witness was a records custodian for the Tarrant County Hospital District, who was called to authenticate some medical records. The second witness, Jeanne Deschner, was a psychologist who testified that she believed appellant was insane at the time he committed the offense.

■ Although motive is not an essential element of a crime, "evidence of motive is always admissible because it is *relevant* as a circumstance tending to prove the commission of an offense." *Bush v. State*, 628 S.W.2d 441, 444 (Tex.Crim.App.1982) (emphasis added). In the present case, evidence that appellant suspected his mother was pregnant could be deemed relevant because it would tend to establish a motive for appellant's actions, and would thus tend to rebut his claim of insanity. Under these circumstances, we do not believe the trial court's determination that the pathologist's testimony was relevant was outside the zone of reasonable disagreement referred to in *Montgomery*. Thus, the trial court did not

abuse its discretion in holding that the evidence was relevant.

Having determined the trial court did not abuse its discretion in holding that the contested evidence was relevant, we must now determine whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See* TEX.R.CRIM.EVID. 403. The trial court's ruling on this issue is also reviewed under an abuse of discretion standard. *Montgomery,* 810 S.W.2d at 391. Additionally, rule 403 favors admission of relevant evidence, and the presumption is that if evidence is relevant, it will be more probative than prejudicial. *Long v. State,* 823 S.W.2d 259, 271 (Tex.Crim.App.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). In keeping with this presumption, the Court of Criminal Appeals has noted that trial courts should favor admission in close cases. *Montgomery,* 810 S.W.2d at 389. Thus, appellate courts should reverse the trial court's judgment only "rarely," and then only after a clear abuse of discretion. *Id.* at 392. As is the case with the question of relevancy, if the trial court's ruling is within the "zone of reasonable disagreement," the appellate court should not reverse the ruling. *Id.* at 391.

"[V]irtually all evidence proffered by a party to a lawsuit will be prejudicial to the opposing party." *Id.* at 378. As such, only "unfair" prejudice will result in the exclusion of relevant evidence. *Id.* The potential for "unfair" prejudice arises when the evidence suggests making a decision on an improper basis, commonly, though not necessarily, an emotional one. *Id.* at 389.

In the present case, as discussed above, appellant did not attempt to rebut the considerable evidence presented by the State that he stabbed his mother. Appellant's defense was that he was insane at the time of the offense. Thus, the only real contested issue in the case revolved around appellant's mental state at the time he stabbed his mother. Under the facts of this case, we do not believe there was a very real potential that the jury would make the determination regarding appellant's sanity on an improper basis, that being the fact appellant's mother was pregnant. On the other hand, the fact appellant's mother was pregnant did have very real probative value in that it tended to establish a motive for appellant's actions, and thus, tended to rebut appellant's defense of insanity. Based on these facts, we do not believe the trial court abused its discretion in determining that the probative value of the contested evidence was not clearly outweighed by the danger of unfair prejudice. Point of error three is overruled.

In point four, appellant contends the trial court erred in denying his motion for mistrial after the prosecutor interjected allegedly prejudicial unsworn testimony of an extraneous offense in final argument at guilt-innocence. The argument appellant complains of occurred when the prosecutor was summarizing the testimony of Dr. Turbeville, the State's expert psychiatrist:

> [PROSECUTOR]: She comes in, she's testified in over 1,000 cases. She's told you about that. She said, "No. This guy has an antisocial personality disorder." That is not—that does not fit an insanity defense. He's narcissistic. He's mean is what she's saying. That's what this case is about. It's a kid who just—remember—remember Calvin says, "Elliott is just being Elliott. Elliott does what Elliot wants to do." *He and his little buddies out there ripping clothes off little girls.* Those acts—[Emphasis added.]

Following appellant's objection to this argument, the trial court instructed the jury to disregard the statement, but denied appellant's motion for a mistrial. On appeal, appellant claims the comment by the prosecutor was so outrageous and prejudicial that the instruction to disregard was insufficient to cure any harm caused by the comment. However, in making this argument appellant ignores the fact that he introduced the evidence which led to the prosecutor's contested argument.

During trial the defense introduced an exhibit consisting of 602 pages of medical records from the Psychiatric Institute of Fort Worth. The State did not object to admission of this evidence. Among the many pages of this exhibit is a social history of

appellant which was taken while appellant was a patient at the Institute. In one portion of this social history it reads:

> [Appellant's] mother shared an incident last year which described the type of boys her son has been associating with. She stated he was with four or five other boys last years [sic] and that *the boys followed a girl home and ended up pushing her down and ripping her clothes off.* The mother of the girl phoned [appellant's] mother and informed her of this incident. [Appellant] denied participating in this though [he] did acknowledge he was there and observed his friends doing this. [Emphasis added.]

■ "Broadly speaking, there are four general areas of permissible jury argument: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement." *Todd v. State,* 598 S.W.2d 286, 296–97 (Tex.Crim.App.1980). Here, the information leading to the contested argument was introduced into evidence by appellant. Thus, the prosecutor's argument could reasonably be deemed as summation of the evidence.

■ Furthermore, even if the argument was improper, an instruction to disregard by the trial court will ordinarily cure any error caused by improper argument unless the statements are so inflammatory that the prejudicial effect cannot reasonably be removed by the curative instruction. *Id.* It is only when the argument is extreme, manifestly improper, injects new or harmful facts into the case, or violates a mandatory statutory provision and thus cannot be cured by an instruction to disregard, that reversal is required. *Moreno v. State,* 821 S.W.2d 344, 354 (Tex.App.—Waco 1991, pet. ref'd). In making this determination, we must examine the argument in light of the entire record. *See McKay v. State,* 707 S.W.2d 23, 38 (Tex. Crim.App.1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986). In reviewing the entire record in the present case, we do not believe the contested argument, assuming it was improper, was so inflammatory that any prejudicial effect could not be cured by the trial court's instruction

to disregard. Appellant's fourth point of error is overruled.

■ In point of error five, appellant contends the trial court erred in overruling his objection to the prosecutor's argument during the punishment phase of trial. The argument appellant complains of stems from the same information and refers to the same evidence as that discussed under point of error four. The contested argument reads as follows:

> [PROSECUTOR]: [L]ook for the punishment that fits the defendant. His antisocial personality, narcissistic. That's not a a [sic] disease or a defect. It is a problem in the way he looks at society. It is him. That is his character. He cares only for himself. The one place that keeps him in line is a prison where there are guards, where there are bailiffs, where there are people who have guns.

> In this case, look for a punishment that deters others. His friends. People that would steal, people that could kill, *people that would tear clothes of young girls.*

> [DEFENSE COUNSEL]: Your Honor, once again, we would object to any extraneous offense and reference to an extraneous offense.

> THE COURT: Overrule the objection. [Emphasis added.]

■ As previously noted, there are four permissible areas of jury argument, one of which is a plea for law enforcement. *Todd,* 598 S.W.2d at 296–97. Here the trial court could have reasonably viewed the State's argument as a proper plea for law enforcement. Furthermore, even if the argument was improper, we believe the argument was harmless in light of the fact appellant introduced this evidence in the first place. *Cf. Purtell v. State,* 761 S.W.2d 360, 368 (Tex.Crim.App. 1988) (any error in admission of evidence is cured where same evidence comes in elsewhere without objection), *cert. denied,* 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989). Point of error five is overruled.

■ In point of error number six, appellant claims the trial court erred in refusing to instruct the jury generally on the law pertaining to the admissibility of written state-

ments. Specifically, appellant claims that because there was some evidence questioning his mental competency, the trial court should have instructed the jury on the law regarding the "voluntariness" of a confession. *See* TEX. CODE CRIM.PROC.ANN. art. 38.22, §§ 6, 7 (Vernon 1979); *Rogers v. State,* 549 S.W.2d 726, 729–30 (Tex.Crim.App.1977). However, at trial appellant did not request an instruction or charge regarding the "voluntariness" of his statements. Rather, appellant requested that the court charge the jury under article 38.23 that they should not consider any evidence obtained in violation of any provision of the Constitution or laws of the United States or the Constitution or laws of the State of Texas. *See* TEX.CODE CRIM.PROC. ANN. art. 38.23 (Vernon Supp.1994).

In requesting a charge under article 38.23, appellant argued that his two statements were obtained without a warrant and were the fruit of an illegal arrest. Appellant did not inform the trial court he was challenging the "voluntariness" of his two statements. Thus, appellant has failed to preserve for appeal any complaint he may have had regarding the "voluntariness" of his statements. TEX.R.APP.P. 52(a). Point of error six is overruled.

In points of error seven through ten, appellant contends the trial court erred in admitting an exhibit entitled "Request To Use The Law Library" form. This request form was signed by appellant while he was incarcerated in the Tarrant County Jail. At trial, appellant objected to the admission of this exhibit as a violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel, and also as a violation of the analogous provisions of the Texas Constitution. Appellant raises these same arguments on appeal.[2]

The form in question is a preprinted sheet which requests various information from inmates seeking to use the law library. One portion of the form reads: "I request to use the law library for the following reasons:" and this is followed by a blank line. When appellant filled out and signed the library request form, he filled in this blank line with the following information: "Bond Reduction, *Insanity,* Punishments, Types of Criminal Homicide." Appellant contends that in seeking information as to why he wanted to use the library, the library request form amounted to custodial interrogation and was violative of his right against self-incrimination and his right to counsel. Specifically, under points of error seven and eight, appellant claims he should have been read his *Miranda*[3] rights before he filled out the form, and under points nine and ten he contends he should have had counsel present when he filled out the form. We disagree.

In *Miranda,* the Supreme Court was concerned that "the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Rhode Island v. Innis,* 446 U.S. 291, 299, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297, 306 (1980). *Miranda* did not hold that all statements obtained by police after a person is in custody should be considered the product of interrogation. *Id.,* 446 U.S. at 299–301, 100 S.Ct. at 1689, 64 L.Ed.2d at 307. As the Court stated in *Miranda:*

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody*

---

**2.** We recognize that the right against self-incrimination and right to counsel clauses of the Texas Constitution warrant an analysis distinct from federal constitutional analysis. *See Heitman v. State,* 815 S.W.2d 681, 690 (Tex.Crim.App.1991). However, appellant neither argues the constitutional provisions separately nor contends there are reasons for distinguishing them in this case. As a result, we will not distinguish between the constitutional provisions, but find them to be the same for the purpose of analyzing whether appel-

lant's right against self-incrimination or right to counsel was violated. *See Santikos v. State,* 836 S.W.2d 631, 632 n. 1 (Tex.Crim.App.) (op. on reh'g), *cert. denied,* —— U.S. ——, 113 S.Ct. 600, 121 L.Ed.2d 537 (1992); *Heitman,* 815 S.W.2d at 690–91 n. 23.

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... * Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966) (emphasis added). Thus, it is clear that the procedural safeguards established in *Miranda* are required, not when a suspect is simply taken into custody, but rather when a suspect in custody is subject to interrogation. *Innis,* 446 U.S. at 300, 100 S.Ct. at 1689, 64 L.Ed.2d at 307. " 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.,* 446 U.S. at 300, 100 S.Ct. at 1689, 64 L.Ed.2d at 307.

The safeguards established in *Miranda* come into play when a person in custody is subjected to either express questioning or its functional equivalent. In *Innis,* the Supreme Court defined "interrogation" as follows:

[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 301–02, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 308 (footnotes omitted) (emphasis in original).

■ In the present case appellant initiated the contact which led to the incriminating information when he requested to use the law library. Although the jail authorities requested that appellant fill out the "Request To Use The Law Library" form, there is no indication that they knew, or had any reason to know, that appellant would fill out the form with incriminating information. Rather, filling out the form appears to have been a routine matter required of every jail inmate who requests to use the law library. Under the facts of this case, we do not believe requiring appellant to fill out the "Request To Use The Law Library" form amounted to custodial interrogation for Fifth Amendment purposes. *See id.,* 446 U.S. at 299–303, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 308. Thus, appellant's points of error seven and eight are overruled.

■ We reach a similar result with respect to appellant's claim that his right to counsel was violated. In *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Supreme Court held that government agents violated the defendant's Sixth Amendment right to counsel when they "used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206, 84 S.Ct. at 1203, 12 L.Ed.2d at 250. Thus, a defendant's Sixth Amendment right to counsel is violated when the statements in question are (1) "deliberately elicited" (2) by a "government agent." *United States v. York,* 933 F.2d 1343, 1355 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991); *United States v. Taylor,* 800 F.2d 1012, 1015 (10th Cir.1986), *cert. denied,* 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987); *State v. Hernandez,* 842 S.W.2d 306, 313 (Tex.App.—San Antonio 1992, pet. ref'd), *cert. denied,* —— U.S. ——, 113 S.Ct. 3049, 125 L.Ed.2d 733 (1993). However, the rule of *Massiah* does not apply to situations where the government agent who elicits the incriminating response does

so exclusively for some other legitimate purpose, or through luck or happenstance obtains an unsolicited incriminating response. *Hernandez,* 842 S.W.2d at 314. *See also Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 2629, 91 L.Ed.2d 364, 384 (1986); *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481, 496 (1985).

In the present case there is no indication the incriminating information was "deliberately elicited." Rather, the evidence simply shows that when appellant requested to use the law library he was asked, as a matter of routine, to fill out the law library request form. Under these circumstances, appellant's right to counsel was not violated. Appellant's ninth and tenth points of error are overruled.

The judgment of the trial court is affirmed.