# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 30, 2010

Lyle W. Cayce
Clerk

No. 06-20736

WENDELL KEITH WHITE

Petitioner-Appellant

v.

RICK THALER, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent-Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JONES,  Chief Judge, and WIENER and BENAVIDES, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

Petitioner-Appellant, Wendell Keith White (White), was convicted of murder and aggravated assault in Harris County, Texas.  White appeals the district court's denial of federal habeas relief as to both convictions, arguing that counsel rendered ineffective assistance.  We find that counsel rendered ineffective assistance by (1) cross examining White regarding his post-arrest silence, which allowed the prosecutor to impeach him with his failure to tell the police his exculpatory version of the events, and (2) failing to file a motion in limine or object to evidence of the murder victim's pregnancy.  We therefore

1

reverse the district court's denial of habeas relief and remand with instructions to grant the writ in accordance with this opinion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

A jury found White guilty of the murder of Latasha Vasquez and the aggravated assault of Tracey Johnson after he ran over the two women with his pickup truck. He was sentenced to 40 years in prison on the murder count and 20 years in prison on the aggravated assault count.

On the night of April 10, 1998, Johnson was playing in a pool tournament in a bar called Koach's Club. When Johnson stepped away from the pool table, White picked up Johnson's cue stick. Upon returning to the pool table, Johnson became very upset because White was using her custom cue stick without her permission and hitting it against the table. She shouted expletives at him, and the bartender told her to "calm it down." Johnson told the bartender that White was harassing her, and the bartender responded, "I don't care you don't need to start trouble." White apologized to Johnson and bought drinks for Johnson's friends. At that point it appeared that the dispute was over.

Johnson testified that at a little before two o'clock in the morning, which was the bar's closing time, White came up behind her, grabbed her breasts, and rubbed against her. No one else saw this incident, and White testified that he did not touch Johnson. Johnson became irate and complained to her friends. She began shouting at White, calling "him just about every name in the book." Johnson and White exchanged heated words but had no physical altercation. Paul Bagley, one of Johnson's friends, had to pull her away from White. The bar was closing and a crowd of people had gathered outside in the parking lot. White then walked away from Johnson and the crowd to his pickup truck, which was

parked in the bar's parking lot.  Johnson and a man called "Marco," who was Johnson's friend, hurriedly followed White to his pickup truck.  Other people also walked up to White's truck.  White entered his truck, shut the door, and started the ignition.  White, who had come to the bar alone, testified that he wanted to "get out of there . . . [b]ecause I'm afraid they're going to jump me."

Johnson was yelling at White and threw her hands up in the air.  It is undisputed that Marco opened the driver's side door, reached in, and hit White in the face at least once as White was sitting in his truck.  White testified that Marco punched him in the face at least six times.  As a result, White lost his glasses and could not see very well. White testified that another man was trying to pull him out of the truck.  White heard someone say:  "Somebody should pull his ass out."  After Marco hit White, Marco and Johnson began walking away from the truck.  White then drove his truck forward, with its driver's side door still open, and ran into a concrete planter that was located directly in front of his parking space.  White testified that, at the time, he did not realize that he had hit the planter.  White "swung into reverse" and almost hit a parked car.  White was driving in the direction of Johnson, who was walking back toward her car in front of the bar with her back to the truck.  White revved his engine,[1] accelerated, and the front passenger side of the truck knocked Johnson to the ground.  White testified that he did not see Johnson and was simply trying to flee from the angry mob.  At this point a crowd of people surrounded White's truck and were banging on it.  White testified that he was "being mobbed.  This truck is being mobbed.  People are running out of there.  Some got cue cases in

---

[1] Witnesses testified that he was "power braking," which they described as simultaneously pressing the accelerator and the brake pedal.  White denied "power braking."

their hands. One of these guys hit a window on the side. It just buckled it right there." He testified that he feared for his life. He started driving off and "people were jumping in front of it and I stopped and . . . they start beating on it and jumping in front of it."

Witnesses testified that when White stopped his truck, they saw Johnson underneath it. White drove forward and the front passenger side tire ran over Johnson. Vasquez, who had been standing nearby with a group of people, apparently saw Johnson and "ran over and told him to stop. She was banging on the hood telling him to stop." Vasquez was at the front of the truck on the passenger's side. When White turned the truck, it hit Vasquez, who fell down underneath the front wheels of the truck. The crowd was yelling, "No stop, she's under the wheels." Witnesses testified that the truck's windows were "up." White again revved the engine and drove it in reverse. Finally, he drove forward, missed the exit to the parking lot, and drove through a ditch to get to the road. Both victims were run over by the truck, apparently more than once.

White testified that when he eventually "got a clear path," he managed to drive out of the parking lot. He testified that he did not realize he had hit either victim.[2] The entire incident involving the truck occurred in "a matter of seconds." At least two people followed White in their cars as he drove home. White testified that they were chasing him and "trying to pull in front of [him]." After he arrived home, the police arrested him.

As a result of being run over, Johnson suffered serious, permanent injuries, and Vasquez died at the scene. The jury convicted White of murdering

---

[2] There is conflicting testimony whether White was wearing his glasses at the time he ran over the victims.

06-20736

Vasquez and committing the aggravated assault of Johnson. He was sentenced to 40 years for the murder conviction and 20 years for the aggravated assault conviction. White's convictions were affirmed on appeal.

White subsequently filed separate state petitions for postconviction relief from each conviction. The state trial judge, who presided over both the trial and habeas proceedings, found that White's trial attorneys were deficient in the following ways: (1) failing to object to the police officer's opinion testimony that White had intentionally committed murder; (2) failing to object to evidence of Vasquez's pregnancy because it was irrelevant and highly prejudicial; (3) questioning White about his failure to tell his exculpatory version of events to police after his arrest, which opened the door to the prosecutor's cross-examination of him regarding his post-arrest silence; (4) unreasonably failing to request jury instructions on lesser included offenses; and (5) failing to object during the punishment phase to the prosecutor's argument that White showed no remorse during victim-impact testimony. Relying most heavily on the ineffective assistance with respect to the admission of White's post-arrest silence, the state trial court recommended a new trial because there was "a reasonable probability that the outcome of the case would have been different but for counsel's error."

In a published opinion, the Texas Court of Criminal Appeals ("TCCA") denied relief, concluding as to each claim that there was either no deficient performance or no prejudice. *Ex parte White*, 160 S.W.3d 46, 53–55 (Tex. Crim. App. 2004). Subsequently, White filed federal habeas applications that were consolidated. He argued that the determination that he did not receive ineffective assistance of counsel involved an unreasonable application of law or

determination of the facts.  White further argued that the TCCA failed to give proper deference to the state trial court's fact-based prejudice determination and unreasonably applied the prejudice prong of *Strickland* by requiring him to prove that he probably would have been acquitted.

White filed for habeas relief in federal court, where the parties consented to proceed before a magistrate judge.  The magistrate judge denied relief, concluding that the decision was not an objectively unreasonable application of federal law.  The magistrate judge granted White's request for a Certificate of Appealability (COA) on whether counsel was ineffective for opening the door to evidence of his post-arrest silence but denied a COA on the remaining issues. This Court expanded the COA to include (1) whether White received ineffective assistance of counsel because his counsel failed to file a motion in limine or to object to the police officers' opinion testimony; failed to file a motion in limine or object to testimony that the murder victim, Vasquez, was pregnant and the fetus died; and obtained his agreement not to request jury instructions on the lesser included offenses of manslaughter and negligent homicide; (2) whether the TCCA failed to give the convicting court's determinations proper deference; and (3) whether the TCCA misapplied the prejudice prong of the ineffective assistance analysis.

II.    MAGISTRATE JUDGE'S AUTHORITY (28 U.S.C. § 636(c))

A.  Civil Actions in General

Although not raised by the parties, we sua sponte address whether the consensual delegation of a 28 U.S.C. § 2254 proceeding to a magistrate judge violates Article III of the Constitution. *E.E.O.C. v. Agro Distribution, LLC,* 555 F.3d 462, 467 (5th Cir. 2009) (explaining that "[a]lthough neither party raises

the issue of subject matter jurisdiction, this court must consider jurisdiction *sua sponte*"). This Court has previously held that, after consent by the parties pursuant to 28 U.S.C. § 636(c), a magistrate judge may conduct the entire jury trial in a civil case and enter final judgment. *Puryear v. Ede's Ltd.*, 731 F.2d 1153 (5th Cir. 1984). We explained that the Magistrates Act is "saved from any constitutional infirmity by its requirement that all parties consent to such transfer and by the power of the district court to vacate the reference to the magistrate on its own motion." *Id.* at 1154 (citing § 636(c)). We also noted that "[e]ach circuit facing this question has reached a similar conclusion." *Id.*

### B.  28 U.S.C. § 2255 proceedings

Although the Fifth Circuit has never specifically addressed whether a magistrate judge has the authority to preside by consent over a § 2254 proceeding, we have held sua sponte that the consensual delegation of a § 2255 proceeding to a magistrate judge does violate Article III of the Constitution. *United States v. Johnston*, 258 F.3d 361 (5th Cir. 2001). In *Johnston*, before reaching the question of the statute's constitutionality, this Court had to determine whether Congress intended to include § 2255 proceedings when it referred to a "civil matter" in § 636(c). *Id.* at 364–66. Although this Court recognized that "[h]abeas petitions have customarily been viewed as civil in nature," *id.* at 364, it explained that whether § 2255 proceedings are "civil or criminal in nature is dependent on the context of the proceedings, including the legislative and statutory framework in which the § 2255 proceeding must be examined." *Id.* at 366. This Court looked to the legislative history which indicated that Congress intended to improve access to the courts and ameliorate the workload of district courts by delegating cases to magistrate judges. *Id.*

06-20736

This Court also looked to the statutory framework, which reflected a "general legislative bias towards allowing magistrate judge oversight of § 2255 proceedings." *Id*. After discussing the legislative history and Congress's intent, we held "that for purposes of § 636(c), a § 2255 proceeding is a civil matter over which Congress intended magistrate judges to exercise jurisdiction upon consent of the parties." *Id*.

In its constitutional analysis, this Court distinguished a § 2255 from a § 2254 proceeding. "[U]nlike the average civil case or a § 2254 proceeding, a § 2255 motion directly questions the validity of a prior federal court ruling." *Id*. at 368. It acknowledged that, in § 2254 proceedings, petitioners challenge prior judgments, but distinguished those proceedings because the attacks involved state court judgments. The Court explained that a magistrate judge's attack on the validity of a district court's prior rulings raises Article III concerns. *Id*. The Court was also concerned because the judgment attacked would involve a criminal case as opposed to a civil case. Further, the Court was aware of the advisory committee note that "a motion under § 2255 is a further step in the movant's criminal case and not a separate civil action." *Id*. at 365 (quoting Rule 1 of the Rules Governing § 2255 Proceedings advisory committee note). The Court explained that "whenever an act delegated to a magistrate judge encroaches upon a district court's exclusive felony trial domain, Article III concerns move to the forefront." *Id*. at 370. And "[n]o one seriously questions that the issue of sentencing is an integral part of the felony criminal process." *Id*. Finally, such a complete delegation to a magistrate judge "presents reviewability problems severe enough to create the impression that magistrate judges are not adjuncts, but are independent of Article III control." *Id*. A

magistrate judge's decision in a consensual delegation of a § 2255 proceeding is not reviewable by the district court. *Id*. at 371. Although a magistrate judge's decision is reviewable on appeal by the appellate court, "'[t]he required control must be more than simple appellate review.'" *Id*. at 371 n.6 (quoting *Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc*., 725 F.2d 537, 544 (9th Cir. 1984)). For Article III purposes, this constitutes insufficient reviewability and control over a magistrate judge's decisions in a federal criminal proceeding. *Id*. Accordingly, the Court held that the consensual delegation of § 2255 motions to magistrate judges violates Article III. *Id*. at 372.

C.    § 2254 proceedings

With respect to § 2254 proceedings, however, other circuits have held that a magistrate judge has the authority to preside by consent. *See Farmer v. Litscher*, 303 F.3d 840 (7th Cir. 2002); *Norris v. Schotten*, 146 F.3d 314 (6th Cir. 1998); *Orsini v. Wallace,* 913 F.2d 474 (8th Cir. 1990). All three circuits determined that Congress intended to include § 2254 proceedings when it referred to civil matters in § 636(c)(1). The Seventh Circuit noted that when Congress passed § 636(c), it was aware that habeas cases were generally defined as civil in nature "and that Congress therefore would have drafted § 636(c) to exclude habeas corpus proceedings expressly if that were the intention." *Farmer*, 303 F.3d at 843. The Courts also relied on the broad statutory language in § 636(c) ("notwithstanding any provision of law to the contrary") to determine that Congress intended to include § 2254 proceedings. *Norris*, 146 F.3d at 324; *Orsini*, 913 F.2d at 476-77. This broad language was intended to "overcome any problem which may be caused by the fact that scattered throughout the code are statutes which refer to 'the judge' or 'the court.'" *Orsini*, 913 F.2d at 477

(quoting H.R. Rep. No. 1609, 94th Cong., 2d Sess. 9 (1976), reprinted in 1976 U.S. Code Cong. & Admin. News 6162, 6169).

With respect to the constitutional analysis, the Seventh Circuit correctly began by explaining that the consent element of § 636(c) cannot "cure [any] constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III." *Farmer*, 303 F.3d at 844. The Seventh Circuit also explained that under § 636(c), the only right waived is the one to have the suit heard by an Article III judge, a personal right that is waivable. *Id.* The Seventh Circuit rejected the appellants' comity argument because it did not raise an Article III question. *Id.*; *accord Johnston*, 258 F.3d at 368-69 (distinguishing § 2254 concerns regarding comity and federalism from Article III concerns). In response to the argument that because magistrate judges are not permitted to preside over federal felony proceedings, they should not be permitted to preside over § 2254 proceedings involving state felony convictions, the Seventh Circuit opined that a state defendant's conviction has a presumption of constitutional regularity and therefore, "the weight of constitutional interests shifts, and greater weight is properly accorded to the underlying policy of the Federal Magistrate Act to assist federal judges in handling an ever-increasing caseload." *Id.* at 845 (internal quotation marks and citations omitted).

Further, the Sixth Circuit characterized the separation of powers issue under Article III as having at least two elements, *Norris*, 146 F.3d at 325, the first element being the "structural interest of maintaining an independent judiciary within the constitutional scheme of tripartite government," *id.* (internal quotation marks and citations omitted), and the second element being

"the personal interest of individual litigants in preserving their right to have claims decided before judges who are free from potential domination by other branches of government." *Id*. (internal quotation marks and citations omitted). The Sixth Circuit explained that because the constitutionality of § 636(c) had already been determined with respect to civil cases in general, in determining whether a § 2254 proceeding should be differentiated from other civil proceedings under § 636(c), only the personal interest element would be at issue. *Id*. Because the personal right to have an Article III judge decide one's case is subject to waiver, the Sixth Circuit perceived "no constitutional infirmity with allowing a magistrate judge to render a final decision in a habeas proceeding under § 636(c)." *Id*.

With respect to whether Congress intended § 2254 proceedings to be considered civil cases for purposes of § 636(c), this Court has already concluded that § 2255 proceedings (which involve challenging a federal criminal conviction) are civil cases, so, a fortiori, § 2254 proceedings too should be considered civil cases and thus encompassed by § 636(c). Although this Court has held that a § 2254 proceeding is not a "civil action" for the purposes of the three-strikes section of the Prison Litigation Reform Act (PLRA), which governs in forma pauperis actions by prisoners, that scenario is distinguishable. *Carson v. Johnson*, 112 F.3d 818 (5th Cir. 1997). Whether habeas proceedings are "civil or criminal in nature is dependent on the context of the proceedings." *Johnston*, 258 F.3d at 366. In the context of the three-strikes section of the PLRA, this Court noted that the Antiterrorism and Effective Death Penalty Act ("AEDPA") has its own separate procedures for abuse of the process, and the AEDPA became effective two days prior to the PLRA. *Carson*, 112 F.3d at 820. Also, "we

06-20736

recognized that applying the three strikes provision to habeas petitions would be contrary to a long tradition of ready access of prisoners to federal habeas corpus." *Id*. (internal quotation marks and citation omitted).  These concerns do not apply in the context of § 636(c).  We therefore conclude that § 2254 proceedings are civil actions for the purposes of § 636(c).

Although this Court has held that the consensual delegation of a § 2255 proceeding to a magistrate judge violates Article III, a § 2254 proceeding does not raise the same Article III concerns about the interplay of co-equal branches of the federal government.  *See Johnston*, 258 F.3d at 368–69; *Orsini*, 913 F.2d at 479 n.8.  Accordingly, we agree with our sister circuits and hold that the consensual delegation of a § 2254 proceeding to a magistrate judge does not violate Article III.

III.    STANDARD OF REVIEW

Because White filed his 28 U.S.C. § 2254 petition for a writ of habeas corpus after the effective date of the AEDPA, the petition is subject to the AEDPA.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Pursuant to the federal habeas statute, as amended by the AEDPA, we defer to a state court's adjudication of a petitioner's claims on the merits unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion

12

06-20736

than the Supreme Court based on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 404–08 (2000). A state court's decision constitutes an unreasonable application of clearly established federal law if it is "objectively unreasonable." *Id*. at 409. Further, pursuant to section 2254(e)(1), state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001).

IV.    INEFFECTIVE ASSISTANCE OF COUNSEL

To establish ineffective assistance of counsel, White must show (1) defense counsel's performance was deficient and (2) this deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We must find that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id*. The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Id*. at 688. While "[j]udicial scrutiny of counsel's performance must be highly deferential," White can demonstrate deficient performance if he shows "that counsel's representation fell below an objective standard of reasonableness." *Id*. However, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *United States v. Webster*, 392 F.3d 787, 793 (5th Cir. 2004) (quoting *Strickland*, 466 U.S. at 689). *Strickland*'s "prejudice" prong requires a reasonable probability that, but for the deficient performance of White's trial counsel, the outcome of his murder trial would have been different. *Strickland,*

13

466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

### A.    Post-Arrest Silence

White contends that counsel rendered ineffective assistance by opening the door to allow the prosecutor to question him about and comment on his post-arrest silence. During direct examination, defense counsel's questioning of White revealed that he did not tell the police his exculpatory version of the events that transpired on the night of the offense. During cross examination, the prosecutor questioned White extensively about his post-arrest silence.

During state habeas proceedings, the trial court ruled that: "The most significant error was the invitation to comment on applicant's post-arrest silence, and the State fully exploited it. Given these circumstances, there is a reasonable probability that the outcome of the case would have been different but for counsel's error." Thus, the trial court recommended that the TCCA grant the writ of habeas corpus. The TCCA *assumed without deciding* that counsel's performance was deficient. *Ex parte White,* 160 S.W.3d at 51. The court then held that there was no prejudice. *Id.* Thus, because the state court did not adjudicate the first prong on the merits, we review the deficient performance prong of *Strickland* de novo and the prejudice prong under the more deferential AEDPA standard. *See Henderson v. Cockrell*, 333 F.3d 592, 601 (5th Cir. 2003). We note that the dissent faults the majority panel members for "plac[ing] themselves in the position of a Texas appellate court and rul[ing] questionably on issues of Texas evidentiary law." Dissent at 1. However, as set forth above, precedent dictates that we review the deficiency prong—including analyzing counsel's performance in the context of Texas evidentiary rules—de

06-20736

novo, which means that we must conduct a review of the claim independent of the state court's determination. *See United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir. 1997) (explaining that de novo review means that "we undertake an independent appellate analysis to determine whether the facts found by the trial court rise to the level of the applicable legal standard").

### 1.    Deficient performance

White argues that counsel should not have questioned him about his post-arrest silence because it allowed the State to exploit this otherwise inadmissible evidence. During direct examination, defense counsel asked White whether he was talking to the officers while being driven downtown to jail and White responded in the negative. Defense counsel also inquired whether White had "given [his] version of this story to anybody? Had [he] told them what happened?" And White again responded "no." Thereafter, the prosecutor extensively cross-examined him about his post-arrest silence—his failure to explain that he had accidentally hit the two victims with his truck because he had lost his glasses and was fleeing from the crowd. Further, during closing argument, the prosecutor argued that White should not be believed because he did not tell the police his current version of the events.

During his state habeas proceedings, White raised the instant claim of ineffective assistance of counsel. In response to this claim, his defense counsel executed an affidavit that provides as follows:

> We did not file a motion in limine or object to evidence and argument that Mr. White failed to tell his exculpatory story to the police after his arrest. Our failure to do so was not strategic. In retrospect, the prosecutor was using Mr. White's post-arrest silence to demonstrate his consciousness of guilt, in violation of United States Supreme Court and Texas precedent.

15

06-20736

As the affidavit makes clear, defense counsel's questioning with respect to White's post-arrest silence was not part of a strategy.

The Supreme Court has held that the prosecution's introduction at trial of evidence of the defendant's silence after being advised of his *Miranda*[3] rights following arrest violates the due process clause. *Doyle v. Ohio*, 426 U.S. 610 (1976). The State argues that there was no basis for counsel to object to the post-arrest silence because White had not been read his *Miranda* rights at that point. The State relies on *Fletcher v. Weir*, 455 U.S. 603, 607 (1982). In *Weir*, the Supreme Court held that "[i]n the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." *Id. See also Jenkins v. Anderson*, 447 U.S. 231, 240 (1980) (explaining that "no governmental action induced petitioner to remain silent before arrest" and therefore "the fundamental unfairness present in *Doyle* is not present").

The parties agree that the police did not advise White of his *Miranda* rights at the time of his arrest.[4] Thus, there was no violation under federal constitutional law. The TCCA, however, has expressly declined to adopt the Supreme Court's holding in *Weir*; instead, under the Texas Constitution, it gives a broader construction to the state privilege against self-incrimination, holding that a defendant's post-arrest, pre-*Miranda* silence could not be used against

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] We note that the TCCA stated that the police arrested White and advised him of his rights. *Ex parte White*, 160 S.W.3d at 50. However, our review of the record shows no support for that statement.

16

him at trial. *See Sanchez v. State*, 707 S.W.2d 575, 579–82 (Tex. Crim. App. 1986). More specifically, in *Sanchez*, the issue was "to what extent may a defendant's post-arrest pre-*Miranda* silence be used to impeach the defendant with regard to exculpatory matters he or she testifies to at trial." 707 S.W.2d at 578. Like the instant case, in *Sanchez*, the record failed to establish that the defendant had been read his *Miranda* rights. The TCCA concluded that such a use of the defendant's silence would violate a defendant's "right to be free from compelled self-incrimination under Art. I, § 10, Texas Constitution." *Id*. The court also concluded that the "rules relating to impeachment prohibit the use of such evidence since post-arrest silence is not probative as prior inconsistent conduct." *Id*. Therefore, Texas law prohibits a prosecutor from impeaching a defendant with his post-arrest silence. Accordingly, pursuant to de novo review, we conclude that counsel's questioning of White regarding his post-arrest silence, which opened the door to the prosecutor's cross-examination of White and subsequent remarks in the prosecutor's closing argument, constitutes deficient performance.[5]

The dissent opines that *Sanchez* does not apply because White, unlike the defendant in *Sanchez*, was not silent while in police custody. Dissent at 5-6. The dissent refers to Officer Cibulski's testimony that White stated he had been home all night.[6] To be clear, we recognize that because the officer testified that White made an inconsistent prior statement, the prosecutor properly questioned

---

[5] We express no opinion as to whether we would reach the same conclusion under the more deferential AEDPA standard.

[6] The dissent also refers to Detective King's testimony that White gave "smart aleck" answers when asked his height and weight.

17

White about the statement.[7]  However, had counsel not opened the door with respect to White's failure to tell the police his exculpatory story, under Texas law, the prosecutor would not have been free to cross-examine White about his post-arrest silence.

Citing *Lum v. State,* 903 S.W.2d 365, 369 (Tex. App.—Texarkana 1995), the dissent  states that "a Texas court found that no *Sanchez* violation occurred under somewhat similar circumstances." Dissent at 6.  In *Lum*, the defendant claimed that the prosecutor had violated his right against self-incrimination by questioning him about his post-arrest silence.  903 SW.2d at 369.  During direct examination, the defendant testified that the police officers "would not let him tell his side of the story." *Id*.  Subsequently, on cross examination, the defendant admitted that the officers had asked him to talk but instead he asked for an attorney. *Id*.   At that point, the officers stopped interrogating him. *Id*.  The Texas Court of Appeals rejected Lum's claim, explaining that the evidence regarding his post-arrest silence was "proper to refute the false impression Lum gave in his testimony." *Id*.  Thus, the dissent correctly states that no *Sanchez* violation was found in *Lum*.   In the case at bar, however, White is not claiming that the prosecutor should have been prohibited from questioning him about his post-arrest silence after defense counsel opened the door.   In other words, White's claim is not that his right against self-incrimination was violated but that his counsel was ineffective for opening the door to allow evidence of his post-arrest silence. In this case, as in *Lum*, there is no *Sanchez* violation because any error was invited.

---

[7] We note that White testified that he did not make any statements to the police.   His position was simply that he remained silent.

06-20736

The dissent also cites to a concurring opinion in White's state habeas appeal. Dissent at 6. In Judge Keller's concurrence, unlike the majority opinion, she reaches the merits of the deficiency prong. *Ex parte White*, 160 S.W.3d at 56. Judge Keller stated that *Sanchez* does not control because White was not silent after his arrest but instead told the police officer he had been home all evening. *Id.* At trial, he admitted that he was at the scene of the crime but claimed he did not know he ran over the victims. *Id.* Under these circumstances, Judge Keller believes that "[i]t was not counsel's questions, but applicant's trial strategy and his testimony that opened the door to cross-examination about what he did and did not say after his arrest." *Id.* In support of that proposition, Judge Keller cited *Anderson v. Charles*, 447 U.S. 404, 409 (1980). *Id.* n.2. We first note that the Supreme Court case is construing federal constitutional law and *Sanchez* recognizes that the Texas Constitution and evidentiary rules afford defendants greater protection against self-incrimination.[8] More specifically, in *Charles,* the analysis addressed whether there was a *Doyle* violation and, as set forth above, there is no *Doyle* violation in White's case. Nonetheless, even assuming *arguendo* that the TCCA would apply the analysis in *Charles*, the prosecutor's questioning of the defendant in *Charles* renders it distinguishable from the instant case.

In *Charles*, the Supreme Court granted certiorari to determine whether the prosecutor's questioning of Charles violated his right against self-incrimination under *Doyle*. 447 U.S. at 406–07. The Sixth Circuit found a *Doyle*

---

[8] Indeed, the Supreme Court has explained that its precedent does not mean that state courts must allow a defendant's silence to be used as impeachment. *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980). "Each jurisdiction remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative then prejudicial." *Id.*

violation based on the prosecutor's questioning of the defendant regarding his post-arrest failure to tell the police officers the "same story he told the jury." *Id.* at 407. A police detective testified that after Charles was arrested, he admitted that he stole the vehicle from the vicinity of Washtenaw and Hill Streets. *Id.* at 405. Charles testified that he did not tell the police anything about the location of the car and that he stole the vehicle while it was parked in a different location. *Id.* At first blush, the circumstances of Charles's cross-examination appear similar to those in the instant case. However, in *Charles,* the Supreme Court made clear that the prosecutor's cross-examination, "taken as a whole, does not refe[r] to the [respondent's] exercise of his right to remain silent; rather [it asks] the [respondent] why, if [his trial testimony] were true, he didn't tell the officer that he stole the decedent's car from the tire store parking lot instead of telling him that he took it from the street." *Id.* at 408–09 (citation and internal quotation marks omitted) (brackets in opinion). More importantly, the prosecutor's "questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *Id.* at 409. Nothing could be further from the truth with respect to the prosecutor's questioning of White. As is painstakingly set forth below, *supra* at 22-28, in the instant case, the prosecutor most certainly was using White's post-arrest silence regarding his exculpatory explanation as a prior inconsistent conduct to impeach him. Indeed, the State does not—and we believe could not in good faith—argue that the cross-examination was not designed to impeach White with his post-arrest silence. Tellingly, at closing argument, the prosecutor urged the jury to conclude that White's post-arrest silence indicated that he had the intent to kill the victims. Thus, because the Supreme Court's holding in *Charles* rests on the

determination that there was no *Doyle* error because the questioning was not intended to draw meaning from the defendant's silence, it is clearly distinguishable from the instant case.  The authorities cited by the dissent do not support the conclusion that Texas precedent would allow the prosecutor's exploitation of White's post-arrest silence but for counsel's invited error.

Accordingly, having concluded that counsel's invitation to cross-examine White regarding his post-arrest silence fell below an objective standard of reasonableness, we turn to the prejudice prong.

### 2.    Prejudice Prong

White contends that he has shown that counsel's deficient performance prejudiced him.   As previously set forth, we review the state court's determination of prejudice under the AEDPA standard.  More specifically, we must determine whether the state court's conclusion that there was not a reasonable probability that, but for the deficient performance of his trial counsel, the outcome of his murder trial would have been different is objectively unreasonable.   The TCCA held that there was no prejudice because (1) there was ample evidence to allow a jury to conclude that White intentionally ran over the victims and (2) White's theory of the case had been undermined because a police officer had testified that White had said that he had been home all night. *Ex parte White*, 160 S.W.3d at 51–52.

To assess the prejudicial effect of this evidence, we now review the pertinent testimony and argument with respect to White's post-arrest silence. During direct examination, defense counsel inquired whether White had "given [his] version of this story to anybody?  Had [he] told them what happened?" White responded that he had not.  During cross examination, the prosecutor

06-20736

asked White whether he had "asked any questions about why you were in jail?"
White responded that he had asked an officer in bookkeeping, who informed him
about the charges against him.[9]  The cross examination continued as follows:

Q.    And I'm sure that when the Fort Bend officers arrived at your
      home that would have been a welcome sight for you.

A.    It was.

Q.    There was a mob of people out there ready to kill you, right?

A.    It was a welcome sight.

Q.    Because there was a mob of people that were about ready to
      kill you.  Isn't that your testimony?

A.    Yes, that's my testimony.

Q.    And did you say to them, thank goodness you're here officer
      because Lord Almighty I was scared to death.  I was about to
      lose my life.

A.    No, I didn't say that.

Q.    Why not?

A.    I just didn't say that.

Q.    Why not?

A.    I just didn't say that.

---

[9]  The prosecutor also questioned White whether he had told Officer Cibulski, who had
transported White back to the scene on the night of the offense, that he had been home all
night.  White denied telling the officer that he had been home all night.  We note that the
question before us is with respect to the use of White's post-arrest *silence*—not the use of any
verbal statement allegedly made by White.

22

06-20736

Q.    Well did you say anything? I'm so glad you're here I'm scared to death. People have been chasing me all night. I thought I was about to die. Did you say any of those things?

A.    They started with the initial conversation. I answered [the] questions they asked me. What was my name and was I driving that white vehicle.

Q.    And that's when you –

A.    That's when I was handcuffed and put in the back of his squad car.

Q.    And did you say to him why am I being handcuffed Lord Almighty I was just about killed out there. Did you say anything like that?

A.    No. I didn't say anything like that.

Q.    Why not?

A.    I don't know why.

Q.    Surely someone that was injured or misjudged would have wanted to set the record straight. Why didn't you do that?

A.    I didn't say that.

Q.    Well why didn't you set the record straight? Does it make sense that you wouldn't?

A.    I didn't say that.

Q.    Why not?

A.    I don't know.

06-20736

Q.    Why didn't you at any time tell them any of these things that you're now telling the jury?

A.    No one ever asked me any questions. Any questions that I was asked I gave a reply to.

Q.    So it doesn't matter if they ask you the question. If they don't ask you're just going to go to jail for something you didn't do. They have to specifically ask you the question.

A.    I was handcuffed. I asked why was I handcuffed. I did ask that. They didn't answer my question. That was the only question. That was enough.

Q.    But you didn't tell them anything about the vicious beating that you received at Koach's Club. You didn't tell them anything about that?

A.    They didn't come to me to listen to a story. I was by myself.

Q.    I guess my question is you're telling the jury that you thought you were about to die that night?

A.    That's correct.

Q.    And the police officer comes in and do you think the police officer is there to take care of what had happened to you?

A.    I'm thinking that he is, yes.

Q.    You were thinking the police officer is there 'cause your wife called him, right?

A.    No. I think he's there because of a traffic violation or something when we were, when they were trying to run me off the road. I thought they might have [seen] part of that.

Q.    So you're glad the police are there because you think –

24

06-20736

A.    Yes.

Q.    You think they're there because he witnessed you commit a traffic violation?

A.    That's correct.

Q.    But yet [he] places you in handcuffs, right?

A.    Right.

Q.    And you're thinking how unjust is this, right?

A.    Right.

Q.    I'm the victim here.

A.    Right. I thought he was talking to the other people there and I thought he might have just been getting their stories first. You asking me what I'm thinking at this point.

Q.    But they didn't put them – he didn't put them in handcuffs, right?

A.    No he didn't.

Q.    He only put you in handcuffs?

A.    That's correct.

Q.    And when did it start to dawn on you that the other people weren't being charged with anything it was just you?

A.    It never dawned on me.

Q.    Never did?

A.    No.

06-20736

Q.    And you never ever tried to set the record straight?

A.    No I didn't.

Q.    And eventually when you were charged with murder and attempted murder then did you say wait what's this all about, I don't know what you're talking about.  Did you say that to anybody?

A.    Anybody where?

Q.    Anytime any - -

A.    Yes, I did.

Q.    Who?

A.    My attorney.

Q.    And when was that?

A.    When I called him.  When I talked to him.

Q.    All right.  But nobody from the police department?

A.    Nobody with the police department ever questioned me or talked to me.

Q.    But you never made any type of effort to tell them or ask them what was going on?

A.    Ma'am I did.

Q.    Who?

A.    I asked the police, the guards.  They don't – they say they don't know what's going on.

06-20736

Q.    Well I'm talking about any of the officers that you dealt with that night specifically.

A.    I had no contact with those officers.

Q.    What about Officer King?

A.    No contact.

Q.    Well he testified that he asked you how tall you were and how much you weighed.  You remember that?

A.    I remember his testimony.

Q.    But are you saying that he wasn't even at the scene?

A.    I never met him before.  That's my testimony.

Q.    So he wasn't even at the scene?

A.    I didn't say he wasn't at the scene.  I never met him.

                    *    *    *    *

Q.    Had no idea why people were coming by and identifying you?

A.    That's correct.

Q.    Had no idea why you were in police custody?

A.    Yes that's correct.

Q.    And you didn't ask any questions?

A.    There was no one for me to ask questions from [sic].

Q.    Eventually you got driven down to the jail true?

A.    That's correct.

Q.    And, did you ask that officer any questions?

A.    There is a thing in the car.  You can't talk to the officers that's driving.

Q.    I guess that wasn't my question.  My question was did you ask?

A.    No I didn't.

Q.    So you didn't ask the officer any questions there?

A.    No.

Subsequently, during closing argument, the prosecutor made remarks about White's post-arrest silence.  The prosecutor stated:

> What is it we can look at to determine what a person's intent was? And there were some people that said if he made a confession to the police, if he told the police what happened and that's obviously a very good indicator of what a person's intent was but we don't have that in this case.

Additionally, the prosecutor also argued that:

> There is not a way in the world that he could not have known that he didn't run over those two girls.  But even so, even if you believe that he didn't once he's [been] told [that he did] don't you think he would tell the police or do something or explain to them in some kind of way what his story is, his innocence?  I was being chased by people wielding pool cues.  I thought I was going to die. I was scared to death.  Did he tell his wife that?  No.  Did he tell Fort Bend [police officers]?  No.  Did he tell Houston Police Department [Officer] Cibulski?  No Did he tell Officer King?  No. Did he tell anybody?  No.  The first time we hear about it is during his trial.  Isn't that convenient?

06-20736

Officer King did tell us that he did inform the Defendant what he was charged with. Told him. Tried to get information from him. And by the way there's a big [mis]conception about *Miranda* rights. To anybody that's been arrested it's only if they plan to get a statement from them to find out what their side of the story is, if they want to tell it the officers are required to tell the Defendant what his rights are, if he's going to make a statement so the fact that Wendell White was not read his *Miranda* rights means nothing because they didn't try to get a statement from him. Don't be misled by that. . . .

The fact that he didn't tell the Houston Police Department or anybody else gives you an indication about his state of mind at the time and how the story developed.

As is clear from the above-quoted portions of the trial, the prosecutor verbally pounded White with his failure to tell the police his exculpatory version of the events. It is apparent that the prosecutor was mocking White's testimony that the crowd had made him fear for his life.[10]  Counsel's opening the door to this testimony allowed the prosecutor to impeach White with his silence as if it constituted prior inconsistent conduct. Further, during closing argument, the prosecutor relied on White's post-arrest silence to argue that White was not credible.[11]  The principal issue at trial was White's intent at the time of the offenses. Thus, White's credibility was the key to his defense that it was an accident. During state habeas proceedings, the same judge who had presided over White's trial found that the "State fully exploited" the evidence of White's

---

[10]  For instance, the prosecutor inquired:  "And did you say to them, thank goodness you're here officer because Lord Almighty I was scared to death."

[11]  In an apparent attempt to assure the jury that they could consider what was communicated to the police officers, the prosecutor argued that the officers were not required to advise White of his *Miranda* rights unless they were obtaining a statement from him.

06-20736

post-arrest silence. Although the state trial judge's opinion does not control our decision, we note that the only judge who observed the witnesses' testimony and evidence concluded that White had established a reasonable probability of a different outcome but for counsel's invited error. In view of the lengthy, unrelenting cross examination of White regarding his post-arrest silence and the prosecutor's reliance on the same to demonstrate that White was not telling the truth when he testified that he did not know that he had run over the victims, we are convinced that the TCCA's conclusion that White had not shown a reasonable probability of a different outcome is objectively unreasonable. In the alternative, even if we were not convinced that the evidence of White's post-arrest silence by itself satisfied the prejudice prong, as discussed below, counsel also failed to exclude the highly prejudicial evidence of Vasquez's pregnancy. The combined prejudicial effect of the post-arrest silence and the death of the unborn child inexorably leads us to conclude that White has shown that the state court's conclusion that there was no reasonable probability of a different outcome is objectively unreasonable. *Richards v. Quarterman*, 566 F.3d 553, 571–72 (5th Cir. 2009) (explaining that but for the "cumulative effect" of counsel's deficient performance it was very likely that the trial would have a different outcome).

         B.    Evidence of Victim's Pregnancy

         White contends that counsel rendered ineffective assistance by failing either to object or file a motion in limine with respect to evidence of Vasquez's pregnancy. At trial, during direct examination by the prosecutor, the medical examiner testified that the autopsy revealed that Vasquez was pregnant. Also, during direct examination, White testified that he had learned in the courtroom that one of the victims was pregnant. During closing argument, defense counsel

referred to the victim's pregnancy on three occasions. In the final closing argument, the prosecutor responded to defense counsel's argument and talked of the killing of the "unborn child."

During the state habeas proceedings, the trial judge, who had presided over White's trial, found that counsel was deficient for failing "to object to evidence of and prosecution argument in the guilt phase emphasizing that Latasha Vasquez was pregnant. Her pregnancy and the death of the fetus were irrelevant to the issue of guilt and highly prejudicial." The TCCA did not address whether counsel's failure constituted deficient performance. Instead, the Court held only that White had not satisfied the prejudice prong of *Strickland*. *White*, 160 S.W.3d at 55. Again, because the state court did not adjudicate the first prong on the merits, we review the deficient performance prong of *Strickland* de novo and the prejudice prong under the more deferential AEDPA standard. *See Henderson*, 333 F.3d at 601.

### 1. Deficient Performance Prong

White contends that counsel rendered deficient performance by failing to either object or file a motion in limine with respect to evidence of Vasquez's pregnancy. The State responds that defense counsel's closing argument indicates that counsel was trying to show that "Vasquez was deliberately indifferent to her own welfare and to that of her unborn child, and second, that her intoxication may have contributed to her own death." However, during state habeas proceedings, defense counsel executed an affidavit that provided in part as follows:

> We did not file a motion in limine or object to evidence that the deceased was pregnant and the fetus died. Our failure to do so was not strategic. We did not consider that this evidence was

06-20736

irrelevant (especially at the guilt-innocence stage), and that any
marginal probative value was substantially outweighed by the
dangers of unfair prejudice.

Defense counsel clearly concedes that the failure to object to the evidence of
pregnancy was not a strategic decision.[12] Moreover, our review of the record
does not provide a basis for failing to object. Thus, we are not persuaded by the
State's apparent contention that counsel was using the evidence of pregnancy as
a matter of strategy.

After de novo review, we conclude that counsel's failure to object to the
evidence of Vasquez's pregnancy fell below an objective standard of
reasonableness. Counsel could have objected to the admission of the evidence
as irrelevant under Rules 401 and 402 of the Texas Rules of Evidence. Rule 401
provides that "'[r]elevant evidence' means evidence having any tendency to make
the existence of any fact that is of consequence to the determination of the action
more probable or less probable than it would be without the evidence." The only
disputed issue at trial was whether White intended to hit the victims with his
truck. The fact that Vasquez was pregnant does not tend to make it more or less
probable that White had the requisite intent to hit either victim. At trial, there
was absolutely no evidence to show that White was aware that Vasquez was

---

[12] We find puzzling defense counsel's statement in his affidavit that he and his co-
counsel "did not consider that this evidence was irrelevant (*especially at the guilt-innocence
stage*)." (emphasis added). Generally speaking, quite the opposite is true. Under Texas law,
"the rules of evidence applicable to the sentencing process are relaxed and much broader in
scope." *Robinson v. State*, 705 S.W.2d 293, 296 (Tex. App. — San Antonio 1986, no pet.); *see
also* Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1) (Vernon Supp. 2002) ("evidence may be
offered by the state and the defendant as to any matter the court deems relevant to
sentencing, including but not limited to . . . the circumstances of the offense for which he is
being tried").

06-20736

pregnant at the time of the offense.    Rule 402 provides that "[e]vidence which is not relevant is inadmissible."    Thus, counsel should have made a proper attempt to keep the evidence from the jury.  Failure to do so constitutes deficient performance under *Strickland*.[13]

We are aware that, in 1904, the TCCA held that  testimony regarding a homicide victim's pregnancy "was admissible as an original circumstance, being part and parcel of the facts and condition of the parties at the time of the homicide; that is to say, it is proper to prove the physical condition of the deceased, and hence the testimony would be admissible as original evidence." *Washington v. State,* 79 S.W. 811, 814 (Tex. Crim. App. 1904).  However, since the Texas Rules of Evidence became effective in 1983,[14] we have found no Texas case citing that proposition.  Thus, *Washington* does not address the relevancy of evidence of pregnancy in light of Rule 401 and Rule 402.  *See Harrison v. State*, 241 S.W.3d 23, 26 (Tex. Crim. App. 2007) (explaining that cases decided before the Texas Rules of Evidence were adopted do not address the proper application of the current rules of evidence).[15]

---

[13]    Additionally, we note that White was not charged with causing the fetus's death. Under Texas law, a defendant can be charged with the murder of an unborn child.  *See Lawrence v. State*, 240 S.W.3d 912 (Tex. Crim. App. 2007) (citing Tex. Penal Code § 1.07(a)(26) and (a)(36)).

[14]    *Harris v. State*, 738 S.W.2d 207, 230 (Tex. Crim. App. 1986).

[15]    In *Mosby v. State,* 482 S.W.2d 256 (Tex. Crim. App. 1972), another case issued *prior* to the adoption of the Texas Rules of Evidence, the TCCA quoted *Washington* for the proposition that the evidence of the victim's pregnancy was admissible to show the condition of the victim at the time of the homicide.  *Id.* at 258.  However, in addition to citing *Washington*, the Court ruled that the evidence that the victim was seven months pregnant was relevant because the defendant had argued that he shot the victim in self defense.  *Id.*  The physical condition and size of the deceased was deemed relevant in light of the defendant's claim of self defense.  *Id.*  Even assuming *arguendo* that, generally speaking, a homicide

33

06-20736

In *Watson v. State*, the appellant was convicted of murdering his mother and argued that the trial court erred in allowing the evidence of the victim's pregnancy because it was not relevant and that any probative value was clearly outweighed by the prejudicial effect of the evidence in violation of Rules 401, 402, and 403.[16]  885 S.W.2d 222 (Tex.App.—Fort Worth 1994), *vacated on other grounds,* No. 1208-94 (Tex. Crim. App. Jan. 11, 1995) (unpublished).  Part of the state's theory was that Appellant "thought his status as an only child was coming to an end and that he was not going to get a 'free ride' any longer." *Id.* at 230.  The court explained that Rule 401 "deems 'relevant' any evidence which influences consequential facts, that is, facts that have something to do with the ultimate determination of guilt or innocence in the case at hand." *Id.*  The court opined that the "evidence that appellant suspected his mother was pregnant could be deemed relevant because it would tend to establish a motive for appellant's actions, and would thus tend to rebut his claim of insanity." *Id.*  The court further explained that "evidence of motive is always admissible because it is *relevant* as a circumstance tending to prove the commission of an offense." *Id.* (quoting *Bush v. State*, 628 S.W.2d 441, 444 (Tex. Crim. App. 1982)).  Having found the evidence relevant, the court then addressed whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.  *Id.* at 231.  The court opined that the possibility of unfair prejudice occurs if the "evidence suggests making a decision on an improper basis,

victim's pregnancy is admissible after the adoption of the Texas Rules of Evidence, we would not find it so in the instant case because there is no evidence that White was aware of Vasquez's pregnancy.

[16] Rule 403 provides that relevant evidence may be excluded on certain grounds, including "if its probative value is substantially outweighed by the danger of unfair prejudice."

commonly, though not necessarily, an emotional one." *Id.* The court found that the evidence of pregnancy was very probative because it provided a motive, which "tended to rebut appellant's defense of insanity." *Id.* The court concluded that under the facts of the case, the probative value of the pregnancy was not clearly outweighed by unfair prejudice. *Id.*

In the instant case, we find no probative value to the evidence of the victim's pregnancy.[17] The evidence of the pregnancy does not tend to make it more or less probable that White had the requisite intent to hit either victim. This is especially so in light of the dearth of evidence that White was even aware that the victim was pregnant. Because there was no strategic reason for counsel's failure to object to this irrelevant evidence, pursuant to de novo review, we conclude that White has shown that such failure constitutes deficient performance.[18]

The dissent disagrees, opining that "[u]nder Texas law, the fact of Vasquez's pregnancy was not clearly inadmissible." Dissent at 8. The dissent cites *Reese v. Texas*, 33 S.W.3d 238, 239-40 (Tex. Crim. App. 2000) for the proposition that, under Texas law, a victim's pregnancy is relevant evidence. Dissent at 7. Contrary to the dissent's representation, in *Reese*, the TCCA did not actually determine the evidence of pregnancy was relevant. Instead, the TCCA stated as follows: "The photograph shows that a pregnant woman died.

---

[17] The dissent states that the majority declined to reach the question of whether the probative evidence of the victim's pregnancy was substantially outweighed by the danger of unfair prejudice under Rule 403. Dissent at 8. However, we expressly conclude that the evidence was not relevant in that it had *no* probative value in light of the facts of the instant case. Rule 403 allows exclusion of *relevant* evidence and was thus inapplicable to our analysis.

[18] We express no opinion with respect to whether we would arrive at the same conclusion under the more deferential AEDPA standard of review.

06-20736

Therefore, we will *assume, without deciding*, that the photograph had at least some relevance to the jury's decision about the special issues." 33 S.W.3d at 240 (emphasis added). The dissent next quotes the following language from a TCCA opinion: "It is true that the death of the fetus was a relevant part of the circumstances of the offense [murder]." *Erazo v. State*, 144 S.W.3d 487, 493 (Tex. Crim. App. 2004). However, the dissent fails to acknowledge that the State's argument in *Erazo* was that the photograph of the dead fetus was "helpful to the jury because the appellant knew the victim was pregnant." *Id*. The dissent also ignores the TCCA's statement that: "It is also true that the fact that the appellant knew that the victim was pregnant and that he was the father of the unborn child is very relevant to the jury's process of tailoring a sentence for this appellant for this offense." *Id*. Significantly, in both of the above cases, the TCCA found that the evidence was inadmissible. Finally, the dissent cites an unpublished opinion issued by a Texas appellate court for the proposition that there is "no precedent holding that evidence of a victim's pregnancy is categorically inadmissible" and the pregnancy was "relevant in describing the nature of the offense [aggravated robbery] to the jury." Dissent at 7 (quoting *Gipson v. Texas,* No. 01-03-00581-CR, 2004 WL 1065428, at *2 (Tex. App. —Houston [1st Dist.] 2004, unpublished writ denied). The dissent fails to recognize that in *Gipson*, the court found that the evidence of the victim's pregnancy was relevant because the appellant was aware of it. In sum, the authorities cited in the dissent wholly fail to show that evidence of the victim's pregnancy was admissible against White. We, of course, are not holding that there is a categorical rule that excludes evidence of pregnancy as not relevant.

06-20736

Instead, we are holding that under the facts of this case the pregnancy was not relevant.

We conclude that, pursuant to an objective standard of reasonableness, competent counsel would have made an attempt to exclude this highly prejudicial evidence. Accordingly, having determined that counsel's performance was deficient, we turn to the prejudice prong.

2.    Prejudice Prong

The next question is whether White has shown that counsel's deficient performance prejudiced him. As previously set forth, pursuant to the AEDPA, we review the state court's determination that there was not a reasonable probability that, but for counsel's failure to exclude the evidence of the victim's pregnancy, the outcome of his murder trial would have been different. More specifically, we must determine whether the state court's conclusion is objectively unreasonable.

There were two witnesses whose testimony referenced Vasquez's pregnancy. The first testimony occurred during direct examination of the medical examiner by the prosecutor. When asked if there were any other extraordinary findings in the internal examination of the victim, Dr. Parungao responded that "[a]t the time of the autopsy that I did at the scene this person was pregnant at the time of her death." The prosecutor then inquired as to how he made that determination. Dr. Parungao responded: "Because I saw the small fetus there in the wound [sic]." The second instance occurred during White's direct examination. White testified that after he was taken to jail for the instant offense he was in a holding cell that had a television and he was watching the news. He testified that he first learned from that news program that he was

37

being charged with murder and attempted murder.  Defense counsel then inquired: "[You first learned when] you were being booked that there was a dead lady, pregnant lady in that parking lot?"  White responded: "That's correct."  On the next page of the transcript, defense counsel inquired: "When is the first time you knew that Latasha [Vasquez] was pregnant?"  White testified that it was "[t]he other day in the court."

Additionally, defense counsel and the prosecutor referred to the victim's pregnancy several times during closing argument at the guilt-innocence phase of trial.  At the beginning of closing argument, defense counsel stated: "It is a horrible case.  You've got families who were destroyed, a young woman who is now dead, an unborn child who is dead, another young woman who is badly crippled."  Counsel then argued to the jury that the issue was whether White had the intent to commit the crimes.  Subsequently, defense counsel stated as follows:

> You remember the one thing about the coroner[']s report that wasn't really flattering about [Vasquez] was that her blood alcohol content was pretty elevated.  It was .07 by some accounts and .09 by other tests depending on the test.  . . .  This is a 17 year old girl that's pregnant.  What is she doing in a bar at 2:00 o'clock in the morning with a blood alcohol level of .07 . . . .

Defense counsel also argued the following regarding White's intent: "The last thing in the world that [White] wanted and he has gone bonkers over this was for those girls to be hurt in any way and for that little 17 year old with a baby inside her to be killed.  That's the last thing this man wanted."

During closing argument, the prosecutor responded to defense counsel's argument as follows:

06-20736

Finally, the Defense tells you that they ask you to look at Latasha Vasquez's behavior, that she's 17 years old and that she was a .07. Does any of that really matter? Does any of it matter? Do you think that because she was 17 and was a .07 she deserves what happened to her? That she deserved to be run over by a truck? That she deserve[s] to have her unborn child killed, to have her chest crushed, to have a tire mark on her arm, to have her family bury her the way that they did? That beautiful young lady. That's called blaming the victim. Taking the attention [a]way from the defendant and blaming the victim. That's not what this case is about ladies and gentlemen. It's not Latasha Vasquez's fault that she was dragged underneath the under carriage of that truck, that her body was mashed, that her body was blown, that her body had to be buried with that of her parents unborn grandchild, granddaughter, whose [sic] five months pregnant. That's not her fault.

During state habeas proceedings, the TCCA opined that the central issue was whether White had intended to run over the victims. *Ex parte White*, 160 S.W.3d at 54. The court further stated that the testimony regarding the pregnancy "was brief and was not directly related to this main issue." *Id*. The Court also stated that the references to the pregnancy during closing argument were brief. *Id*. Ultimately, the Court concluded that even if counsel had successfully objected to the testimony regarding the pregnancy, it did not find a probability of a change in the outcome of the trial. *Id*. at 55.

White contends that the TCCA reliance on the briefness of the testimony is error. White argues that "[b]revity does not render inadmissible testimony less prejudicial or argument about it less persuasive." He also asserts that the Court used circular reasoning to conclude that the evidence of the dead unborn child was not prejudicial because it was irrelevant to whether White intentionally ran over the victims.

We do not necessarily agree with the TCCA's assessment that the testimony and argument with respect to the victim's pregnancy was "brief." Defense counsel brought up the victim's pregnancy twice during the direct examination of White and three times during closing argument. The prosecutor asked two questions regarding the fetus and referred to the unborn child twice during closing argument. In total, the jury was reminded nine times during the guilt-innocence phase that Vasquez's unborn child died as a result of White's actions. Further, the prosecutor's closing argument regarding the unborn child being killed as the victim was "dragged" and "crushed" by the truck was likely to appeal to the jury's emotions and encourage the jury to make its guilt-innocence decision on an emotional basis. The references likely contributed significantly to the jury's decision to find White guilty of murder. "The touchstone of the prejudice inquiry is the fairness of the trial and the reliability of the jury or judge's verdict in light of any errors made by counsel, not solely the outcome of the case." *Johnson v. Scott*, 68 F.3d 106, 109 (5th Cir. 1995) (citing *Strickland*, 466 U.S. at 696). The murder conviction rested on the jury believing beyond a reasonable doubt that White intended to kill Vasquez. The jury's verdict demonstrates that it had a reasonable doubt that White intended to kill Johnson (the person with whom he had argued) because the jury acquitted him of attempted murder, opting instead to convict him of a lesser included offense. It is undisputed that White had an altercation with Johnson. In contrast, there was no evidence that White had any negative interaction with Vasquez prior to the offense. The jury had a reasonable doubt that he intended to kill Johnson, but nonetheless found beyond a reasonable doubt that White intentionally killed Vasquez. Indeed, in the context of another argument, the State admits in its

06-20736

brief that it was "plausible" that the "jury might acquit White rather than finding him guilty of [Vasquez's] murder." A careful review of the trial record reveals that the evidence that White intended to kill Vasquez pales in comparison to the evidence that White intended to run over Johnson. Under these circumstances, the jury's verdict of intentional murder is not reliable. Accordingly, we find objectively unreasonable the state court's conclusion that there is not a reasonable probability that the outcome of the case would have been different but for counsel's deficient performance.

In the alternative, even if we were not convinced that the evidence of the murder victim's pregnancy by itself satisfied the prejudice prong, as discussed above, counsel also failed to exclude testimony of White's post-arrest silence. The combined prejudicial effect of the post-arrest silence and the death of the unborn child inexorably leads us to conclude that White has shown that the state court's conclusion that there was no reasonable probability of a different outcome is objectively unreasonable.

C.    Remaining Grounds of Ineffective Assistance

In light of our decision granting relief on the above grounds of ineffective assistance of counsel, we need not address the remaining grounds.

IV.    CONCLUSION

For the above reasons, the district court's judgment denying habeas relief is REVERSED, and the case is REMANDED, with instructions to grant the writ and require a retrial of White within a reasonable time to be determined by the district court.

06-20736

JONES, Chief Judge, dissenting:

With due respect, I dissent from the majority's decision to grant habeas corpus relief on the basis of ineffective assistance of trial counsel. AEDPA mandates that we apply a "doubly deferential judicial review" to ineffectiveness claims. *Knowles v. Mirzayance*, ___ U.S. ___, 129 S. Ct. 1411, 1420 (2009). The majority, in effect, hold otherwise.

This is not a case where exculpatory evidence was concealed from the jury or where counsel failed to uncover evidence that could have assisted the defense. This was a fully and carefully tried case featuring many eyewitnesses to the crimes and virtually no disagreement on the facts of what the defendant did. The question of White's intent to murder was hotly contested, but the jury verdict is well supported by the evidence.

The majority focus on counsel's two alleged trial errors and conclude that because of these errors, the verdict is so unreliable as to render the Texas courts' decision "objectively unreasonable" in applying *Strickland*. The majority, in my view, commit three mistakes. First, the majority offer a version of the trial record that minimizes the strong evidence against White. Second, to find trial error, the majority place themselves in the position of a Texas appellate court and rule questionably on issues of Texas evidentiary law. Finally, the majority's

06-20736

prejudice evaluation turns on the unduly constrained factual summary. The upshot of these errors is to thwart the deference that we owe to the state court procedures. As this court has recognized, " '[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " *Richards v. Quarterman*, 566 F.3d 553, 561 (5th Cir. 2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933 (2007)). *Richards* also noted that, " 'because the *Strickland* standard . . . is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.' " *Richards*, *id.* (quoting *Knowles v. Mirzayance*, 129 S. Ct. at 1420).

### 1. The Facts

The majority describe how Tracey Johnson's barroom dispute with White escalated over several hours, culminating in White's groping her just as Koach's Bar closed. White left the bar and got into his truck, which was parked in front of a restaurant in the strip center where the bar was located. A friend of Tracey's punched White and bloodied him, but Tracey and her friend walked away.

Five eyewitnesses testified to what ensued.

43

06-20736

White started his truck, and it shot forward and hit a planter in front of the restaurant. Then he backed up. White paused before his next move. A witness saw him wearing his eyeglasses. That witness testified that White had not seemed drunk that evening.

The majority omit to mention that White had a choice at this point. He could have turned right, out of the parking lot and directly into the street, freeing himself from the "dangerous" crowd. But he did not make that choice. Instead, he turned left and headed toward the front door of Koach's and straight toward Tracey. A mere thirty feet separated him from Tracey. These five eyewitnesses all testified that White had the time and space to have avoided hitting her, and there were other ways he could have left the parking lot. All five eyewitnesses concluded his acts were intentional.

After White knocked Tracey under his truck, a crowd gathered and began pounding on the truck and yelling at him to stop. Latasha Vasquez climbed on the hood and banged it, in an effort to save her friend. Again, White had a choice. He abruptly moved back and forth several times. Vasquez was knocked down and under the truck. She was run over three times, Tracey at least two. One witness likened the truck's motion in driving over the bodies to crossing a speed bump.

44

06-20736

When White left the scene and drove home, two witnesses tailed him. They testified that he was speeding, maneuvered around traffic, and turned a number of corners in his subdivision before arriving home. Evidently, his vision was unimpaired for those purposes.

The coroner described Vasquez's broken body. Much of her skin had been scraped off by abrasive contact with the pavement and truck tires. Nearly all her ribs were crushed, her pelvic and femur bones broken, and her heart ruptured. She had deep bruises on her back and legs. That she was pregnant merely added to an already horrific description.

These are the facts supporting the jury verdict of murder and against which we must measure the impact of counsel's alleged errors and the reasonableness of the state court's decision.

### 2. Counsel's Evidentiary Errors

The Texas Court of Criminal Appeals declined to decide whether White's attorneys, Mr. and Mrs. Mingledorff, were ineffective because they (a) failed to object, and indeed opened the door, to cross-examination about their client's "post-arrest silence," and (b) failed to object, and commented on, the coroner's evidence that Latasha Vasquez was pregnant. No doubt, the majority felt obliged to rule on these points to set the stage for *Strickland*'s prejudice

06-20736

component. Prejudice arises for habeas purposes only as a result of errors by trial counsel. *Strickland*, 466 U.S. 668, 684–85, 104 S. Ct. 2052, 2063. It is dubious, however, that counsel, both of whom have decades of experience in criminal law, made the mistakes now attributed to them.

First, it is not clear under Texas law that White could not be examined about his post-arrest conduct. In its case in chief, the prosecution offered the testimony of Officer Cibulski, who transported White from his home back to Koach's for identification by the witnesses. Cibulski said that White told him "he didn't know that was going on, that he had been sleeping in his house all night long when the Fort Bend County deputies pulled him out of the house." Detective Bob King reported White's sarcastic response to routine questions about his height and weight; White answered that he was ten feet, six inches tall and weighed 443 pounds and 6 ounces. Thus, White was not "silent" while in police custody. At trial, White had to deny his statement to Officer Cibulski in order to support the defense strategy that he was the victim of an angry mob.

These facts distinguish White's case from *Sanchez*, on which the majority rely. *Sanchez* held that the "rules relating to impeachment prohibit the use of [post-arrest silence] since [such conduct] is not probative as prior inconsistent conduct." *Sanchez v. State*, 707 S.W.2d 575, 578 (Tex. Crim. App. 1986). In

46

*Sanchez*, the defendant never said anything to police following his arrest, which occurred two years after the killing for which he was charged. At trial, however, when he attempted to claim self-defense, the prosecutor cross-examined him about his failure to speak up at the time of his arrest. Here, White did speak up contemporaneously. Defense counsel "opened the door" to cross-examination in an effort to distance White from his own post-arrest speech. *Sanchez* therefore does not directly control this case. Indeed, a Texas court found that no *Sanchez* violation occurred under somewhat similar circumstances. *Lum v. State*, 903 S.W.2d 365, 369 (Tex. Ct. App. 1995) (cross-examination of defendant that elicited a different story about his post-arrest conduct from what he testified to on direct examination was "proper to refute the false impression Lum gave in his testimony"). In White's habeas appeal, two justices of the Texas Court of Criminal Appeals separately concurred to make clear that, though the court did not consider trial counsel's alleged deficiency, *Sanchez* did not control. *Ex parte White*, 160 S.W.3d 46, 56 (Tex. Crim. App 2004) (Keller, P.J., concurring). Thus, I cannot agree with the majority's certainty that counsel erred. Their actions were necessary to pursue their defensive strategy.

Further, even a successful objection to cross-examination of White's "post-arrest silence" would not have gained much, because White's credibility was

06-20736

already compromised. His statement to Officer Cibulski directly contradicted the story he told his wife that very evening and his later testimony.

Ms. Vasquez's pregnancy raises another issue of Texas evidence law that the majority strain to portray as error. As the majority acknowledge, Texas has long held that the damage inflicted on a victim by her assailant, including the death of a child in her womb, is admissible at trial.[1] The majority distinguish older, on-point cases because they predate the Texas rules of evidence. *See, e.g., Washington v. Texas,* 79 S.W. 811, 814 (Tex. Crim. App. 1904); *Mosby v. Texas,* 482 S.W.2d 256, 258 (Tex. Crim. App. 1972). Respectfully, it is difficult to understand how pregnancy, unlike any other evidence of bodily condition uncovered in an autopsy, is "irrelevant" such that it is inadmissible under Rules 401 and 402 of the Texas Rules of Evidence. Indeed, Texas law is explicitly to the contrary. *See Reese v. Texas,* 33 S.W.3d 238, 239–40 (Tex. Crim. App. 2000) (finding relevant the fact "that a pregnant woman died" as demonstrating the "results" of the defendant's actions); *Erazo v. Texas,* 144 S.W.3d 487, 493 (Tex. Crim. App. 2004) ("It is true that the death of the fetus was a relevant part of the

---

[1] Under Texas law, a person commits murder when he "intentionally or knowingly causes the death of an individual" or "<u>intends to cause serious bodily injury</u> and commits an act clearly dangerous to human life. . . ." Texas Penal Code § 19.02 (emphasis added). Loss of a fetus is a serious bodily injury under Texas law. *St. Clair v. Texas,* 26 S.W.3d 89, 100 (Tex. App. 2000); *Edinburgh Hospital Authority v. Trevino,* 941 S.W. 2d 76, 79 (Tex. 1997).

circumstances of the offense [murder].”); *Gipson v. Texas*, No. 01-03-00581-CR, 2004 WL 1065428, at *2 (Tex. App.–Houston 2004) (unpublished) (writ denied) (stating that there is “no precedent holding that evidence of a victim’s pregnancy is categorically inadmissible” and that the fact of pregnancy was “relevant in describing the nature of the offense [aggravated robbery] to the jury.”).  Nor was this evidence unduly prejudicial, a question that the majority decline to reach. Any number of bodily conditions—*e.g.*, being in a wheelchair, elderliness, blindness, terminal illness—might arouse jurors’ sympathy.  Thus, in a murder case, a Texas court held undue prejudice arose not from the *fact* of the victim’s pregnancy but only from an inflammatory color photograph of the victim and her unborn child lying together in a casket. *Reese*, at 33 S.W. at 242–43.  Under Texas law, the fact of Vasquez’s pregnancy was not clearly inadmissible.  Failure to object to its admission was not error and created no *Strickland* deficiency.

### 3. Prejudice

The majority speculate that the prejudice arising from Vasquez’s pregnancy, coupled with the prosecutor’s cross-examination of White’s “post-arrest silence,” tipped the scales to a verdict of intentional murder.  All one can say is that the majority’s speculation is no more informed than that of the unanimous Texas Court of Criminal Appeals.  We know that the jury was not

unduly prejudiced with regard to Tracey Johnson by the cross-examination of White's "post-arrest silence"; the jury convicted White of aggravated assault rather than attempted murder of Tracey.  My speculation, which is as good as the majority's, is that Ms. Vasquez's pregnancy was no more compelling to the jury than the testimony that White's truck bumped up and down over her chest three times and crushed it as if it were a beanbag.

My further speculation is that, to the extent there is uncertainty about the reliability of a murder verdict, White made his bed tactically and ought to lie in it.  Not only did White object when the State requested a lesser-included offense instruction of aggravated assault against Tracey Johnson, but he refused to allow a lesser-included offense instruction in regard to Ms. Vasquez's death.  In these decisions, White and his counsel selected an all-or-nothing strategy, and the evidence fully supports the jury's verdict.

The Supreme Court has repeatedly admonished that "it is not enough to convince a federal habeas court that, in its independent judgment, the state court decision applied *Strickland* incorrectly." *Woodford v. Visciotti*, 537 U.S. 19, 27, 123 S. Ct. 357 (2002) (quoting *Bell v. Cone*, 535 U.S. 685, 699, 122 S. Ct. 1843 (2002)).  According to the Supreme Court, the state court's decision in *Woodford*, while "perhaps" incorrect, was not objectively unreasonable, given the strength

06-20736

of the aggravating evidence. *Id.* at 27, 123 S. Ct. at 361. The issue in this case was whether White intentionally ran over Ms. Vasquez. The Texas Court of Criminal Appeals identified the correct legal standard and referred to it consistently and appropriately throughout its opinion. Based on its review of the evidence, the court concluded there was not a reasonable probability that the outcome of the case would have been different if counsel had not committed the alleged errors and that White was therefore not prejudiced. Even if this ultimate conclusion was incorrect, it was not, under the "doubly deferential" standard applied to ineffective claims in a habeas proceeding, *Knowles*, *supra*, objectively unreasonable.

I respectfully dissent.[2]

---

[2] While I concur in the conclusion that Article III of the Constitution was not violated when the parties consented to proceed in this federal habeas action before a United States Magistrate Judge, this result is somewhat troubling. When federal courts exercise our habeas corpus jurisdiction to overturn the decisions of a state's highest court, we directly interfere with state sovereignty. Article III judges should assume ultimate responsibility for deciding these consequential cases, although they may choose to accept a report and recommendation from a magistrate judge. I am especially troubled, however, by the frequent resort to magistrate judges in death penalty cases, which represent both a potential interference with state courts' most significant criminal cases as well as vindication of the petitioners' most significant rights.